UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
JEFFREY AND LINDA WYROSTEK,             )
                                        )
          Plaintiffs,                   )
                                        )
     v.                                 )    C.A. No. 10-351 S
                                        )
WILLIAM NASH, JR., Individually         )
and in his Official Capacity as         )
Building/Zoning Official and            )
TOWN OF WARREN, by and through          )
its Finance Director CHERYL             )
SILVA in her Official Capacity,         )
                                        )
          Defendants.                   )
_____ )

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

     "A breeze ruffled the neat hedges of Privet Drive,
which lay silent and tidy under the inky sky, the very last
place you would expect astonishing things to happen." J.K.
Rowling, Harry Potter and the Sorcerer's Stone 17
(Scholastic Press 1997).  And yet, according to Plaintiffs
Jeffrey and Linda Wyrostek ("Plaintiffs" or "Wyrosteks"),
astonishing things did happen at Number Four Privet Drive.[1]

     The Wyrosteks come to court seeking declaratory and
injunctive relief, as well as damages, against the Town of

_____
     [1] This Number Four Privet Drive, unlike the infamous
Dursley residence, Little Whinging, County Surrey, England,
is located squarely in the Muggle World, in Warren, Rhode
Island.

Warren, Rhode Island ("Warren") and William J. Nash, Jr., a Warren building and zoning official ("Nash", and collectively with Warren, "Defendants"). They allege that the construction of their home was delayed, at great cost, by a series of actions that Nash took, including issuing a stop work order and requiring that continued construction be subject to certain inspections and regulatory approvals. Plaintiffs claim that these actions violated their due process and equal protection rights under the Fifth and Fourteenth Amendments to the United States Constitution, and Article One, Section Two of the Constitution of the State of Rhode Island.

Before the Court is a motion for summary judgment filed by Defendants (ECF No. 27). For the reasons set forth below, Defendants' motion is GRANTED and summary judgment is entered in Defendants' favor on all counts.

I.   Facts

The Wyrosteks purchased a vacant parcel of land at Four Privet Drive in Warren in April 2004. (Compl. ¶¶ 5-6, ECF No. 1.)   In July 2007, Plaintiffs applied for and received a permit to build a single-family residence. (<u>Id.</u> at ¶ 7.)   That the construction phase did not go according to plan is to put it mildly.

Although Plaintiffs had submitted a permit application indicating that the basement of the house was to be a crawl space, they instead constructed a full basement. (Defs.' Statement of Undisputed Facts in Supp. of Mot. for Summ. J. ("Defs.' SUF") ¶¶ 9-10, ECF No. 28.) On August 23, 2007, Nash issued a stop work order based on concerns that the full basement would result in the structure exceeding town-imposed height restrictions, and requested that Plaintiffs submit "as-built" plans. (Compl. ¶ 8.) In the meantime, in August 2007, the owner of abutting property contacted Nash with concerns that the grading of the new construction would adversely affect his property through increased water runoff. (Defs.' SUF ¶ 12.)

On September 24, 2007, Robert Boyer ("Boyer"), a land surveyor hired by Plaintiffs, submitted engineering data to Nash addressing Nash's height concerns.[2] (Compl. ¶¶ 10, 12.) Shortly thereafter, Nash responded by letter, requesting some additional information. (Defs.' SUF ¶ 13.)

Between October and December 2007, Plaintiffs encountered a series of additional setbacks. In October, Nash required that Plaintiffs redesign portions of the lot to address drainage and runoff concerns. (Compl. ¶ 16.)

---

[2] Plaintiffs allege that this data was sent to Nash twice, first on September 6, but Nash responded at that time that he was "too busy." (Compl. ¶ 10.)

In November, Nash required that Plaintiffs provide data about rain runoff from the roof and about soil erosion control and stabilization.[3]   (Id. at ¶¶ 17-18.)   Then, in December, Warren officials sent a letter to Plaintiffs inquiring as to what steps they intended to take to address disrepair in a drainage detention pond located across the street from Plaintiffs' home.[4]   (Id. at ¶ 19.)

On December 12, 2007, Boyer delivered additional engineering data to Nash regarding the height of Plaintiffs' home.  (Id. at ¶ 23.)  Nash then sent a letter to Plaintiffs lifting the stop work order, but noting that Plaintiffs needed to submit as-built plans addressing the runoff and drainage concerns prior to receiving a certificate of occupancy ("CO").   (Id. at ¶¶ 24-25.) Construction resumed in January 2008. (Id. at ¶ 27.)

In February 2008, the Wyrosteks received a bill from Pare Engineering ("Pare"), a firm that Warren had engaged

---

[3] While Plaintiffs allege that a neighboring property was built with no such requirement, Defendants point out that the Wyrosteks ordered and installed a significant amount of soil, or fill, which changed the topography of the property. (See Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") 21, ECF No. 27-1.)

[4] While Plaintiffs complain that none of their neighbors received a similar notice, the record indicates otherwise. (See Defs.' Mem. Exs. O and P, ECF No. 27-2.)

to review certain of Plaintiffs' engineering data.[5]  (Id. at
¶ 28.)  As part of its review of Plaintiffs' data, Pare had
recommended to Nash and to Boyer that Plaintiffs record the
existence of the drainage system on their property deed.
(Defs.' Mem. Ex. F, ECF No. 27-2.)  Although it was in the
form of a suggestion, Plaintiffs characterize this
correspondence as a "new requirement" and suggest that such
a requirement had not previously been imposed on a single-
family residence in Warren.  (Compl. ¶ 22.)

Construction continued throughout much of 2008, until
the project entered the inspection phase in the fall.  On
September 10, the project failed a plumbing inspection, and
Nash required that the Wyrosteks obtain a fire sprinkler
permit, which they did on September 15.[6]  (Id. at ¶¶ 33,
37.)  Then, on September 23, Nash failed the home's
insulation inspection.  (Id. at ¶ 38.)  On September 30,

---

[5] This fact is the basis for Plaintiffs seeking a
declaratory judgment that they are not liable for the fees
that Pare incurred.  Defendants contend, however, that the
issue need not be addressed as Warren is no longer seeking
payment of these funds.  (Defs.' Mem. 33.)  Accordingly,
this claim is denied as moot.

[6] Plaintiffs allege that this inspection was delayed
because Nash failed to respond to telephone calls.  (Compl.
¶¶ 30-31.)  That Nash was slow to respond to the Wyrosteks
is a consistent theme.  Defendants point out, however, that
Nash was generally prompt in his handling of issues,
particularly given the many demands on his time imposed by
multiple municipal responsibilities.  (See Defs.' Mem. 16.)

Nash again conducted an insulation inspection, and this time gave his approval. (Id. at ¶ 41.)

In March 2009, the property was ready for CO inspections, ostensibly the last hurdle facing the Wyrosteks. The first inspection took place on March 5, when Nash failed the project for a cellar handrail violation.[7] (Id. at ¶¶ 49-50.) Nash conducted a second CO inspection five days later, and this time failed the project because of an issue with a vapor barrier. (Id. at ¶ 52.) Finally, on March 11, Nash conducted a third CO inspection and approved the project. (Id. at ¶ 53.)

Plaintiffs paint Nash as some kind of a Draco Malfoy character, planting obstacles in their way for sport or spite, and singling them out, imposing obligations never previously imposed on owners of single-family homes in Warren. For example, Plaintiffs point to the suggestion that they record certain engineering documents on their deed, Nash's requirement that they submit as-built plans, and the requirement that they obtain a fire sprinkler permit as evidence of his crusade against them.[8] Plaintiffs

---

[7] Plaintiffs allege that a neighboring property had passed its CO inspection despite lacking a handrail on an outdoor deck. (Compl. ¶ 50.)

[8] (See, e.g., Pls.' Mem. in Supp. of Objection to Defs.' Mot. for Summ. J. 5, ECF No. 33-1) ("In the history

offer as proof that certain other single-family homes under construction in the vicinity were not subject to similar requirements.   (See Pls.' Statement of Undisputed Facts ("Pls.' SUF") ¶¶ 26-28, ECF No. 34.)

Plaintiffs filed suit in August 2010, alleging that Nash was motivated by malice or ill will, and that his actions were reckless or made with callous indifference to their constitutional rights.[9]   (Compl. ¶ 57.)   Plaintiffs seek compensatory and punitive damages, injunctive relief in the form of a prohibition against harassment by Nash or other Warren officials, and, as noted above, a declaratory judgment that Plaintiffs are not liable to Warren for the cost of Pare's engineering services.   (Id. at ¶¶ 60-63.)

II.   Discussion

Summary judgment is appropriate when, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009).   "A genuine issue of fact exists

---

of Warren, Rhode Island generally . . . no one has been treated the way the Wyrosteks have been treated.").

[9] It should also be noted that Plaintiffs allege that Nash withheld evidence and lied during his deposition after commencement of this suit.   (See Pls.' Statement of Undisputed Facts ¶ 53-54, ECF No. 34.)

where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Taylor, 576 F.3d at 24 (internal citation and quotation marks omitted). Because the Court concludes that Defendants' conduct, as it is alleged or as established in the undisputed facts, does not give rise to claims for due process or equal protection violations, the entry of summary judgment is appropriate.

A.   Due Process

Plaintiffs assert that Nash's actions violated their right to substantive due process.  The due process clauses of the United States and Rhode Island Constitutions each prohibit the deprivation of life, liberty or property without due process of law.  U.S. Const. amend. XIV, § 1; R.I. Const. art. I, § 2.  As the similarity of the texts would suggest, due process analysis under both documents is identical.  See, e.g., Rhode Island Depositors Econ. Prot. Corp. v. Brown, 659 A.2d 95, 100 (R.I. 1995).

"[I]n order to state a substantive due process claim of any ilk, a plaintiff must allege behavior on the part of the defendant that is so outrageous that it shocks the conscience." Mongeau v. City of Marlborough, 492 F.3d 14, 19 (1st Cir. 2007).  There is no precise formula for determining when conduct rises to the level of the conscience shocking behavior necessary to sustain a

8

substantive due process claim.  Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006).   But, courts have previously described such behavior as "extreme and egregious," "truly outrageous, uncivilized and intolerable," and "stunning." Id. (internal citations omitted).   Moreover, what is clear is that not every perceived slight or discourteous act by a public official constitutes a due process violation, and the federal courts are not designed to be a Universal Miss Manners, overseeing the day-to-day conduct of town hall business.   See Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992).

Some examples of conduct that has been found to be conscience shocking are illustrative: cases involving corruption or self-dealing, hampering development to interfere with otherwise constitutionally protected activity, bias against an ethnic group, Blain v. Twp. of Radnor, 167 Fed. Appx. 330, 333 (3d Cir. 2006) (citing Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 286 (3d Cir. 2004)), bribery, Mongeau, 492 F.3d at 19-20, and the threatening of municipal officials by political leaders, Nestor Colon Medina, 964 F.2d at 47.   A run-of-the-mill dispute between a developer and a town official typically will not amount to conscience shocking behavior.   Mongeau, 492 F.3d at 19; see also Creative Env'ts, Inc. v.

Estabrook, 680 F.2d 822, 833 (1st Cir. 1982) ("Every appeal
by a disappointed developer from an adverse ruling by a
local . . . planning board necessarily involves some claim
that the board exceeded, abused or 'distorted' its legal
authority in some manner, often for some allegedly perverse
(from the developer's point of view) reason.").

Plaintiffs' due process claim arises from: (1) Nash's
decision to issue the stop work order; (2) his requirement
that continued construction and issuance of a CO be subject
to further regulatory approval; and (3) his alleged
withholding of evidence and lying in his deposition.

The issuance of the stop work order does not support a
substantive due process claim.  The record indicates that
Plaintiffs' installation of a full basement significantly
departed from plans that had previously been approved by
Warren officials.  It is understandable then that Nash
would issue a stop work order to seek assurances that the
height of the completed structure would not violate
applicable town restrictions.

Plaintiffs argue that the fact that the finished home
adhered to the town height restrictions is evidence that
Nash was irresponsible in his decision to issue the stop
work order in the first place. (Pls.' SUF ¶ 44.) Even if
one were to conclude that Nash exercised poor judgment in

this regard (which is by no means apparent), this alone does not rise to the level of conscious shocking behavior. See, e.g., Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006) (finding that a mistake in judgment on the part of a municipal official would not shock the conscience).

Plaintiffs allege further that Nash's actions after the initial issuance of the stop work order were conscience shocking. They point to Nash's demand for as-built plans, his insistence on drainage remediation, the required fire sprinkler permit, and the many failed inspections as examples. However, courts assessing conduct that went far above and beyond what is alleged here have found the conduct not conscience shocking. See, e.g., Eichenlaub, 385 F.3d at 286 (applying requirements to plaintiff's property not applied to other properties, subjecting plaintiffs to unannounced and unnecessary inspections and enforcement actions, and delaying permits and approvals); Licari v. Ferruzzi, 22 F.3d 344, 349-50 (1st Cir. 1994) (revocation of permits, unauthorized issuance of enforcement orders, and delays in approving an amended permit application).

The record indicates that Nash's demands of the Wyrosteks, while undoubtedly burdensome, were sought in

good faith to require strict adherence to municipal building code. The sort of malicious, self-serving conduct that courts have found to be conscious shocking in the due process context simply cannot compare.

Plaintiffs final pitch is that Nash both withheld evidence during discovery, and lied under oath during his deposition. (Pls.' SUF ¶¶ 54-55.) These claims, like the ghost of Moaning Myrtle, are plainly vaporous.

Plaintiffs allege that Nash withheld an email that he sent on October 14, 2008 to a Pare employee, which implied that Nash would not issue the Wyrosteks a CO until they made payment on the fees owed to Pare. (Pls.' SUF, Ex. 33, ECF No. 34-5.) Plaintiffs suggest that this quid pro quo, and the withholding of the email, are evidence of Nash's invidious motive. This is just Hufflepuffery. First, because the email correspondence in question appears to be nothing more than a communication about fees owed to Pare, it is arguable that the email was not even covered by Plaintiffs' discovery request. Second, although threatening to withhold CO approval might suggest an improper motive in some circumstances, the record indicates that Nash failed the first two CO inspections because of legitimate structural deficiencies, and then ultimately

approved the project notwithstanding the fees, all within six days.

Finally, Plaintiffs incredulously assert that Nash "lied" during his deposition regarding his recollection of the date on which he issued the stop work order. Nash stated, based on a review of his notes, that he recalled issuing the stop work order on August 23, 2007. (Pls.' SUF ¶ 54.) Plaintiffs, outraged, point to the set of notes in question, which in fact suggest that Nash issued the order in "early August 2007." (Id. at Ex. 37, ECF No. 34-5.) This discrepancy, they say, is evidence of Nash's deceit and reverence of the Dark Arts of municipal malfeasance. Nash's confusion (by a mere couple of weeks) about the date of issuance of his stop work order in a deposition occurring some three years after the fact leaves this Court's conscience decidedly un-shocked.

The bottom line is this: at worst, Plaintiffs' allegations depict Nash as being highly demanding and perhaps a bit inflexible. In a word, a stickler. Perhaps Nash could even be fairly characterized as a pain in the back-side. But Nash's behavior, even when viewed in the light most favorable to Plaintiffs, while perhaps not the model of courtesy or efficiency, does not come close to

shocking the conscience.   Thus, recovery under substantive
due process law cannot be had.

    B.   Equal Protection

    Plaintiffs next allege that they were denied equal
protection under the Fourteenth Amendment of the United
States Constitution, 42 U.S.C. § 1983, and Article One,
Section Two of the Constitution of the State of Rhode
Island.   Broadly speaking, the Equal Protection Clause
provides that "similarly situated persons are to receive
substantially similar treatment from their government."
Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004).

    Typically, a plaintiff asserting an equal protection
violation is required to demonstrate that "compared with
others similarly situated, [he] was selectively treated . .
. based on impermissible considerations such as race,
religion, intent to inhibit or punish the exercise of
constitutional rights, or malicious or bad faith intent to
injure a person."   Id. (quoting Barrington Cove Ltd. P'Ship
v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 7 (1st Cir.
2001)) (emphasis omitted).   However, in certain cases, a
plaintiff may advance an equal protection claim challenging
adverse zoning or land-use decisions rendered by a town or
its local officials under the so-called "class of one"
theory.   Such a claim is cognizable only when a plaintiff

14

"alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Cordi-Allen v. Conlon, 494 F.3d 245, 250 (1st Cir. 2007) (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)) (per curiam). Importantly, both theories require that the plaintiff prove dissimilar treatment vis-à-vis similarly situated third parties.

Plaintiffs clarify, for the first time, in their objection to the motion for summary judgment, that they base their equal protection claims on the "class of one" theory.[10] (See Pls.' Mem. in Supp. of Their Objection to Defs.' Mot. for Summ. J. 11, ECF No. 33-1.) It is arguable that this theory is a newly-minted cause of action not set forth in the complaint and therefore subject to dismissal. See Steeves v. City of Rockland, 600 F. Supp. 2d 143, 179 (D. Me. 2009) (internal citations omitted).

---

[10] Defendants briefed the issue of whether Plaintiffs had identified similarly situated third parties, but did not brief the issue of whether there was a rational basis for any disparate treatment. Instead, concluding based on the complaint that Plaintiffs were asserting a traditional equal protection claim, Defendants briefed the issue of whether any of the allegedly adverse actions had been malicious or undertaken in bad faith. Defendants cannot be faulted for drawing this conclusion, as the complaint makes no mention of the "class of one" theory and Plaintiffs raise this issue for the first time in opposition filings to Defendants' motion for summary judgment.

Nevertheless, the Court will consider the claim properly brought, but finds that because Plaintiffs have failed to establish that they were treated differently from other similarly situated individuals, they are precluded from establishing liability under either a traditional or "class of one" equal protection theory. Moreover, the record makes clear that even if Plaintiffs were similarly situated, a "class of one" claim would fail because there was a rational basis for Defendants' actions; and a traditional equal protection claim would fail because there is no evidence that Defendant's actions were undertaken maliciously or in bad faith.

"[P]laintiffs claiming an equal protection violation must . . . identify and relate *specific instances* where persons *situated similarly in all relevant aspects were treated differently*." Cordi-Allen, 494 F.3d at 250-51 (quoting Buchanan v. Maine, 469 F.3d 158, 178 (1st Cir. 2006)) (emphasis in original). To prove substantial similarity, "plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." Id. at 251 (quoting Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006)). While the standard "does not require there be an '[e]xact correlation,' there must be sufficient proof on the

relevant aspects of the comparison to warrant a reasonable inference of substantial similarity." Id. (internal citations omitted). Therefore, Plaintiffs "must show that the parties with whom [they] seek[] to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile." Id. (internal citations omitted).

The Wyrosteks repeatedly state that Nash singled them out and subjected them to regulatory hurdles not previously imposed on other single-family homeowners. Specifically, they allege that Nash required them to provide an erosion control and soil stabilization procedure, despite the fact that the property across the street was developed without any such requirement. They point to Nash's request that they submit as-built plans, obtain the fire sprinkler permit, and compensate Pare for its services, and suggest that they are unique among single-family homeowners in Warren to endure these requirements. Finally, they contend that they alone were the recipients of a suggestion from Warren officials that they record certain engineering documents on their deed.

While Plaintiffs provide evidence indicating that other single-family homes in the vicinity were not subject

to these requirements, this is comparing quaffles to
snitches, and such generalized comparisons to other homes
overlook the unique challenges posed by this particular
project.   See Cordi-Allen, 494 F.3d at 251 ("It is
inadequate merely to point to nearby parcels in a vacuum
and leave it to the municipality to disprove conclusory
allegations that the owners of those parcels are similarly
situated.").   For example, the fact that the Wyrosteks
ordered and installed a large quantity of fill,
significantly changing the property's topography and
prompting a neighbor to voice concerns about water runoff,
gave Nash ample reason to request the erosion and soil
stabilization procedures.   Likewise, the change to the
foundation required by the installation of the full
basement instead of a crawl space not surprisingly prompted
Nash to require as-built plans to assure that the home
would not exceed applicable height restrictions.   See
Cordi-Allen, 494 F.3d at 252 (finding that the project that
plaintiffs intended to undertake, but that had been
rejected by municipal officials, could not usefully be
compared to projects undertaken by their neighbors because
of differences in the size, scope and timing of the
projects).

18

Further, Plaintiffs never demonstrate whether any of these other single-family residence owners made a significant change in their building plans without notifying Defendants, and Plaintiffs never state whether any of the other residence owners had neighbors who raised zoning, elevation or runoff concerns. Because a plaintiff's obligation to prove that he or she is similarly situated to the third parties allegedly treated differently is a prerequisite to establishing liability under either the traditional or "class of one" equal protection theories, the Wyrosteks cannot prevail.

Even were the Wyrosteks to demonstrate that they are similarly situated, they cannot satisfy the second elements of either a traditional or "class of one" equal protection claim. Were Plaintiffs asserting traditional equal protection claims (as the complaint would suggest), they have not shown that any differing treatment was unconstitutional, that such selective treatment was "based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Tapalian, 377 F.3d at 5; see also Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995).

Malicious or bad faith intent claims "are infrequent." _Rubinovitz_, 60 F.3d at 911.   "Normally, such a plaintiff must establish more than that the government official's actions were simply arbitrary or erroneous; instead, the plaintiff must establish that the defendant's actions constituted a 'gross abuse of power.'"   _Tapalian_, 377 F.3d at 6 (citation omitted).   The First Circuit has held that "an arbitrary denial of a permit" does not "rise above the constitutional threshold" for equal protection claims, even if the denial was in violation of state law and in bad faith.   _Baker v. Coxe_, 230 F.3d 470, 474 (1st Cir. 2000).

In _Rubinovitz_, plaintiffs alleged equal protection violations when city officials cut off their utilities, charged them with code violations, interfered with their hiring of a contractor, and otherwise frustrated the use of their property after plaintiffs evicted a friend of a city official.   60 F.3d at 908-09.   Even with this vendetta, the First Circuit found that there was "only barely enough evidence" to indicate a "malicious orchestrated campaign causing substantial harm."   _Id._ at 912.

The case here, even when viewed in the light most favorable to Plaintiffs, does not submit anything even approaching the level of a "gross abuse of power." _Tapalian_, 377 F.3d at 6.   What is before this Court appears

to be a pretty typical case of bureaucratic red tape, but nothing that demonstrates an "abuse of power that shocks the conscience, or action that is legally irrational." Baker, 230 F.3d at 474.   Thus, even were Plaintiffs to demonstrate that they are similarly situated, they could not satisfy the second prong of a traditional equal protection claim.

Finally, were Plaintiffs to proceed, as they attempt to clarify at this late stage, on the "class of one" theory, the record reflects that Nash and other Warren officials had a rational basis to make their many demands based on Plaintiffs' early divergence from the project specifications.   See Cordi-Allen, 494 F.3d at 254.   As a result, again assuming that Plaintiffs were to prevail on the issue of being similarly situated, they likewise cannot satisfy the second prong of a "class of one" equal protection claim.

C.   Qualified Immunity and Injunctive Relief

The parties extensively briefed the issue of whether Nash, in his role as a government official, is entitled to qualified immunity.   Because the Court finds that Nash's conduct does not amount to a constitutional violation, any further discussion of this issue is unnecessary.

21

Finally, as noted above, with respect to Plaintiffs' claim for declaratory relief regarding liability for payment of Pare's fees for engineering services, the Court accepts Defendants' representation that Warren is no longer seeking these fees, and thus this claim is moot.

III. Conclusion

That the Wyrosteks encountered so many setbacks and cost overruns in the construction of their home is regrettable. But the record indicates that these setbacks and overruns were the result of an early deviation from the project specifications, combined with the oversight of a demanding but scrupulous public official. These circumstances, while unfortunate, cannot be said to give rise to viable due process or equal protection claims. As such, Defendants' motion for summary judgment is GRANTED.

IT IS SO ORDERED.

*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  October 31, 2013